## G. FEIL v. STATE.

No. A-10450.   Sept. 5, 1945.

(161 P. 2d 770.)

134

Mauntel & Spellman, of Alva, and Grester H. LaMar, of Guymon, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, G. Feil, was charged in the district court of Texas county with the crime of murder; was tried, convicted of manslaughter in the first degree, with the punishment left to the court. The trial court thereupon sentenced the defendant to serve a term of eight years' imprisonment in the State Penitentiary, and the defendant has appealed.

The defendant was a resident of Hooker, and, at the time of the homicide, was deputy sheriff of Texas county.

On the night of February 19, 1943, a basketball game was played in Hooker between the high school teams of Hooker and Guymon. After the game was over, it had been arranged that a public dance would take place at the Odd Fellows' Hall building in the main part of town, some distance away from the high school. One "BG" Burdge, a high school boy living in Hooker, had charge of the dance. The deceased, Grady Wayne Thompson, lived at Guymon and had come to Hooker with several other Guymon high school students to see the basketball game and had remained in Hooker for the dance.

Several boys had congregated on the steps leading up to the dance hall and "BG" Burdge had ordered the boys to either come into the dance hall or get off of the steps. A quarrel ensued between the deceased and Burdge which resulted in a fist fight between these two boys. The defendant and the city marshal, one Kuhn, were notified, and they arrived at the scene of the fight just as it was ending. The defendant arrested the deceased, Grady Wayne Thompson, took him by the arm and started towards the town jail. As they got to about the middle of the street, Grady Wayne Thompson broke loose from the defendant and ran back into the alley towards the large crowd which had congregated around the dance

hall. The defendant started chasing the deceased. After they had run quite some distance, the deceased commenced gaining on the defendant, and the testimony of the witnesses varied as to the distance separating them. Some of the witnesses estimated that the deceased was 30 feet ahead of the defendant, while one witness thought there was 20 or 25 yards between them. The defendant called to the deceased to stop or he would shoot. One witness said that immediately after the defendant had made this statment, the defendant shot at the deceased and the deceased fell. Some of the other witnesses heard the shot and saw the deceased fall, while many others heard the shot and rushed to the alley and saw Grady Wayne Thompson lying on the ground dead from a gunshot wound in the head. Some of the state's witnesses testified that the defendant was standing there with a gun in his hand and ordered the crowd to stand back or they would "get some of the same."

The theory of the defense was that the defendant yelled at the deceased to stop or he would shoot. That the deceased had turned a corner in the alley and was out of sight of the defendant at the time the defendant fired the shot. That the defendant did not point the gun at the deceased, but fired it in the air at an angle of about 45 degrees, and that the only way it could have struck the deceased was by reason of its hitting some object and being deflected.

It is first argued that certain testimony admitted over objections of the defendant was prejudicial and inadmissible. This statement was the testimony of the witness Usrey that, when the defendant, Feil, was chasing the deceased, he heard Jake Kuhn, the city marshal, yell to Feil, "Shoot the son of a bitch." The case of Cecil v.

Territory, 16 Okla. 197, 82 P. 654, 8 Ann. Cas. 457, is cited in defendant's behalf to support this contention. We have examined this case and do not think that it is in any way applicable to the state of facts before us.

The alleged objectionable statement was first testified to by the witness Hargrove. No objection was interposed at that time. When the witness Usrey testified to the same statement, counsel for defendant did not object at the time the question was asked, but after the answer had been given, counsel moved the court to withdraw the statement from the jury, which motion was denied.

The city marshal and the defendant came to the dance hall together as peace officers allegedly for the purpose of keeping order. According to the testimony of the defendant and some of the other witnesses, Marshal Kuhn took the witness Burdge by the arm, while the defendant arrested the deceased. The exclamation of Kuhn about which complaint is made was in the course of the commission of the crime and evidently encouraged the defendant to do the very act which he committed. The record shows that immediately after the exclamation by Kuhn the defendant fired the fatal shot.

While an ordinary statement not made by Kuhn in the course of the commission of the crime would be inadmissible as hearsay, when such statement is directed at his fellow officer and the state shows that the defendant relied and acted upon the statement, it is not objectionable on the ground that it is hearsay. 10 R. C. L. 959; Mills v. Riggle et al., 83 Kan. 703, 112 P. 617, 20 Am. Jur. 454.

It would appear that a statement made under such circumstances is also admissible as a part of the res gestae.

In Baysinger v. Territory, 15 Okla. 386, 82 P. 728, 729, it is stated:

"Where a declaration or statement is made by a bystander during the progress of an altercation, which results in one of the parties shooting and killing the other, and which remark gives character to an act of the accused, which act is a proper subject of proof on the trial, such statement may be introduced in evidence as a part of the res gestae."

It is next contended that the trial court committed error in permitting the jury to separate over the objection of the defendant. The record does not support this contention. The record discloses the following in connection with this proposition:

"At this point the court took a recess until 2:30 p.m., the court first admonishing the jury to keep together and not talk about the case. The jury then left the courtroom in charge of the bailiff, with instructions to be back in their box at 2:30 p.m.

"Mr. Mauntel: The defendant now objects to the jury being permitted to go with the bailiff who has not been sworn to take care of said jury, to keep them together and to follow out the instructions of the court.

"The Court: The court feels that the objection is not timely for the jury has been gone several minutes from the courtroom in charge of the court bailiff, and the objection will be overruled, as it is impossible to swear him at this time.

"Mr. Mauntel: Exception."

After the jury had returned to the box, the bailiff was sworn and testified that he kept the jury together during the lunch period and that he did not allow anyone to communicate with them. The individual jurors were then asked whether they had heard the case discussed during the recess and they each stated that the

case was never mentioned. Under such a state of the record, it is apparent that no prejudice resulted to the defendant by reason of the failure of the court to swear the bailiff, if, in fact, the bailiff was not sworn.

It is next insisted that the court erred in giving instructions Nos. 10 and 11 to the jury.

Instruction No. 10 reads:

"You are instructed that it is the duty of the sheriff and his deputies to arrest every person who commits an offense in his or their presence, and you are instructed that one voluntarily engaging in a fight is committing a public offense and in violence of the laws of the State of Oklahoma.

"If you find from the evidence that the deceased Grady Wayne Thompson was on the 19th day of February, 1943, and immediately prior to his death, voluntarily engaged in a fight in the town of Hooker, Texas County, Oklahoma, and that the defendant, G. Feil, was then and there a deputy sheriff of Texas County, Oklahoma, and saw said deceased engaged in said fight, it was his duty to place the deceased under arrest.

"In making an arrest the officer is authorized to use such force as may be reasonably necessary to complete the arrest of such person sought to be arrested, and the officer may use such force as is reasonably necessary to retain control of the prisoner after he is arrested.

"However, you are instructed that a peace officer has no lawful right to shoot and kill a person that is attempting to escape arrest for a minor offense, by running away, and if he does so, he will be guilty of murder or manslaughter in the first degree as the case may be."

Counsel state that the first three paragraphs of this instruction correctly state the law, but further state that the last paragraph nullifies the three preceding paragraphs and is tantamount to a peremptory instruction

to the jury to find the defendant guilty of murder or manslaughter. No authorities are cited to sustain this contention.

We have given this instruction careful consideration. It is a fair statement of the law. A peace officer does not have the right to shoot and kill a person fleeing to escape arrest for a misdemeanor. In addition to that, this instruction must be read in connection with all of the other instructions which were given, and, when so read, it correctly states the law.

Instruction No. 11 complained of was evidently copied verbatim from an instruction approved by this court in the case of Lady v. State, 18 Okla. Cr. 59, 192 P. 699, 701. The evidence in Lady v. State, supra, presents a similar state of facts to those involved herein, and we see no reason why the same instruction approved in Lady v. State, supra, should not be applicable herein. The argument of the defendant is directed to the failure of the court to define the word "wilfully," as used in the first part of the instruction, wherein the court stated:

"You are instructed that any person who willfully discharges any species of firearm, airgun, or other weapon in any public place, or in any place where there is any person to be endangered thereby, although no injury to any person shall ensue, is guilty of a misdemeanor."

This part of the instruction follows the language of the statute. If any criticism may be made of this instruction, it would be directed at the failure of the court to define the term "public place," as used in the statute, and not at the failure of the court to define the word "wilfully." However, this instruction, considered as a whole, is a fair statement. There was no request for any further definition of any word used in said instruction.

No reasonable jury could have done other than return a verdict of guilty under the facts of this case. It was a very regrettable tragedy. The jury could hardly have been expected to believe the statement of defendant that he fired in the air above the head of the deceased and that the only way the deceased could have been struck would have been by the bullet having been deflected. The testimony of the doctor who examined the deceased eliminated this theory of the defense. The doctor testified that the bullet entered the head on the right side about the hair line and came out on the left side of the head about an inch lower than the point of entry. The doctor further testified:

"A. The point of entrance was a small, clean round hole, and the point of exit was a large jagged hole; there was no question as to which way the bullet traveled."

If the bullet had struck a substance hard enough to have deflected it, it would have been flattened before striking the deceased and would have caused a jagged hole at the entrance of the bullet into the head. The defendant, prior to this tragedy, had borne an excellent reputation in the community where he resided, which makes this homicide all the more regrettable. The defendant was inexperienced as an officer and, despite his good reputation as a law-abiding citizen, his temperament and training was such that he should not have been entrusted with carrying a gun. The jury did not assess the punishment but left the punishment to be fixed by the court. The prior good reputation of the defendant and other factors in his favor were evidently taken into full consideration by the court when he assessed the punishment at only 8 years' imprisonment.

We can perceive of no errors in this record which can be said to be so substantial in their nature as to have

deprived the defendant of a fair trial. Undoubtedly, there was some tension at the trial, because an incident such as happened here in a community where both of the parties were well known would be widely discussed. Under all the circumstances, it appears to us that the trial court conducted the trial in a fair and able manner and that the judgment of conviction should be affirmed.

It is so ordered.

BAREFOOT, P. J., concurs. DOYLE, J., not participating.